UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 16-11080-RWZ


PATRICIA KARTER

v.

PLEASANT VIEW GARDENS, INC.,
HENRY HUNTINGTON, and
ROBERT LADUE


<u>MEMORANDUM OF DECISION</u>

March 31, 2017


ZOBEL, S.D.J.

In 2011, plaintiff Patricia Karter began developing an idea for a business that would locally grow and sell salad greens.  She reached out to Henry Huntington, Chief Executive Officer of Pleasant View Gardens ("PVG"), a large ornamental flower grower, about this endeavor, and in 2012, they entered into a partnership.  Plaintiff then identified Robert LaDue, a grower, as another participant, and he began collaborating with plaintiff and Huntington.  Plaintiff and Huntington had reached an agreement under which plaintiff would have an equity stake in the new company.  However, before formalizing this agreement, Huntington and LaDue decided to move forward without plaintiff, and Huntington/PVG registered a company without her.  In this lawsuit, plaintiff makes various allegations against some or all of defendants Huntington, PVG, and LaDue.  <u>See</u> Docket # 1-1.  Defendants have moved to dismiss all claims.  <u>See</u> Docket # 6.

## I.    Factual Background

The following facts are recited as alleged in the complaint (Docket # 1-1).  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 5 (1st Cir. 2011).

Plaintiff, a Massachusetts resident, has built and worked with companies in various sectors of the economy.  She co-founded Dancing Deer Baking Company in 1994, served as its Chief Executive Officer from 2000 to 2010, and then served as its Chairperson Emeritus from 2010 to 2014.  In or around 2011, plaintiff began developing the idea of a locally grown salad greens product.  She called the venture "LightEffect Farms" and registered it as a limited liability company with the Massachusetts Secretary of State.  From 2011 through 2015, plaintiff devoted substantial resources to developing the business.

Around April of 2011, plaintiff approached Huntington to learn about his operation.  Huntington appeared interested in plaintiff's plan, and the two "agreed to stay in touch."  Docket # 1-1, at ¶ 19.  Plaintiff reached out to Huntington again around September of 2012.  They discussed entering a partnership[1] between LightEffect Farms and PVG.  In the proposed partnership, LightEffect Farms would produce salad greens, "which would be grown and cultivated in greenhouses owned by the new venture near PVG's current operations in Loudon, NH."  Id. at ¶ 21.  By the fall of 2012, Huntington agreed that each party would have an equity stake in the venture.

---

[1]        Throughout her complaint, plaintiff uses the terms "partnership" and "venture" interchangeably.  Accordingly, I do as well in this decision, even though these terms are not in fact identical.  "Joint venturers are subject to the same fiduciary duties of good faith and loyalty as are partners. . . . Generally the relationships between the parties to a joint venture are so similar to those of partners that their rights, duties, and liabilities are tested by similar or identical rules. . . . The Uniform Partnership Act, [Mass. Gen. .Laws ch.] 108A, § 1 et seq. (1986 ed.), thus is generally applicable to joint ventures by analogy, though it does not govern directly."  Doiron v. Castonguay, 519 N.E.2d 260, 262 n.2 (Mass. 1988) (citations omitted).

Plaintiff and Huntington each took steps to further the venture.  Plaintiff worked without pay, used her own resources to pay staff to help develop the business model, and, in reliance on the promises made with Huntington, declined opportunities to work with other potential partners.  Huntington provided financial resources to pay consultants that plaintiff had identified to help with market research and refining their business model.

Around September of 2012, Karter introduced Huntington to LaDue, a grower who had previously operated a commercial greens-growing operation in New York.  LaDue began collaborating with plaintiff and Huntington based on their existing agreements.  During the winter of 2012 to 2013 plaintiff and Huntington/PVG "divided up the costs of exploring their joint venture, while [plaintiff] continued to work without pay as part of her contribution to the effort." Id. at ¶ 32.  "Huntington and PVG entered into a consulting agreement with Mr. LaDue and paid his consulting fees."  Id.  Plaintiff used her own resources to compensate staff as well as "to pay certain costs associated with site exploration."  Id.

Plaintiff and Huntington "reaffirmed their commitment to the partnership" in the middle of 2014.  Id. at ¶ 33. On approximately August 27, 2014, plaintiff provided Huntington with a memorandum that stated she would be entitled to an equity stake in the venture and that the business would be called LightEffect Farms.  As the two continued to work together, plaintiff proposed receiving some payment for the services she would provide in 2014.  They entered into a "'consulting agreement' to provide [plaintiff] with modest income simply to tie her over as the partners moved towards actualizing their plan."  Id. at ¶ 38.  The agreement stated that it was not the entire

3

agreement between the parties and that a "Purchase Agreement" would be executed at a later point.  The fees plaintiff received through the consulting agreement were a fraction of what she usually charged for her consulting services.  Around January of 2015, plaintiff, Huntington, and LaDue made a formal presentation about the venture to PVG's executive and ownership team, Huntington's advisors, and his bank, Farm Credit East.  At the presentation, the parties represented that the business's team included plaintiff, Huntington, and LaDue.

Around March of 2015, Huntington sent plaintiff a proposed term sheet, which provided that each partner would have equity in the business.  However, plaintiff alleges that "[t]he term sheet . . . deviated sharply in other ways from the parties' prior agreements and suggested that Mr. Huntington had induced [plaintiff] to forfeit years of her personal and professional resources by making promises he apparently did not intend to keep."  Id. at ¶ 49.  Nevertheless, the parties continued to collaborate on the venture and discuss the terms of the "Purchase Agreement."  During this time, Huntington continued to acknowledge plaintiff's right to an equity stake in the company.

On approximately October 30, 2015, plaintiff and Huntington finalized the terms of the venture.  They agreed to meet to formalize the terms on November 6, 2015.  On November 5, 2015, the day before meeting with plaintiff, Huntington/PVG, with LaDue's knowledge, registered a new corporation, "lēf Farms" with the New Hampshire Secretary of State's office.  The name "lēf Farms" came from "LightEffect Farms, LLC," the company plaintiff had registered with the Massachusetts Secretary of State in 2011.  At the November 6 meeting, Huntington told plaintiff that he and LaDue had decided to move forward with the venture without her.  Huntington did not offer plaintiff any rights,

4

equity, or compensation.  Plaintiff tried to resolve the dispute amicably.  However, her attempts at discussion were unavailing, and Huntington and LaDue proceeded without her.

On May 13, 2016, plaintiff filed the present suit in the Massachusetts Superior Court.  Defendants removed the case to federal court on June 9, 2016, and then moved to dismiss the complaint.

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  For purposes of a motion to dismiss, the court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor.  See Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 52–53 (1st Cir. 2013).

## III.    Analysis

Defendants contend that each of the ten counts included in plaintiff's complaint must be dismissed.[2]

---

[2]    Plaintiff's complaint is based, at least in part, on Massachusetts law, and her opposition to defendants' motion to dismiss assumes that Massachusetts law applies.  Defendants state that "[t]he vague nature of Plaintiff's allegations makes it difficult to determine which actions she alleges occurred in Massachusetts, and which actions she claims occurred in New Hampshire.  These vagaries render undertaking an analysis of the appropriate law to apply to this dispute difficult on the face of the Complaint."  Docket # 7, at 5 n.3.  Defendants then apply Massachusetts law in their motion to dismiss and reply.  Given that both parties rely on Massachusetts law, I too apply Massachusetts law in this

### A.    Count I – Unfair and Deceptive Trade Practices Under Mass. Gen. Laws ch. 93A

In Count I of the complaint, plaintiff alleges that defendants engaged in unfair and deceptive acts and practices in violation Massachusetts General Laws Chapter 93A, §§ 2 and 11.  Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a).

In seeking to invoke Chapter 93A, plaintiff faces the obstacle that "[t]he protections of Chapter 93A are not available to parties in a strictly private transaction." KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 23 (1st Cir. 2003).  "Included in this classification are 'disputes . . . between individual members of a partnership arising from partnership business[] and transactions and disputes between parties to a joint venture.'"  Id. at 23–24 (quoting Linkage Corp. v. Trs. of Bos. Univ., 679 N.E.2d 191, 207 n. 33 (Mass. 1997)); see also Debnam v. FedEx Home Delivery, 766 F.3d 93, 96-97 (1st Cir. 2014) (explaining that 93A is unavailable to "someone seeking to sue his or her business partner").

Plaintiff tries to avoid this hurdle by maintaining that to determine whether she can invoke 93A, the court must follow a "dual inquiry: first, [it] assesses whether the interaction is 'commercial' in nature, and second, it evaluates whether the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.'" Linkage Corp., 679 N.E.2d at 206.  She contends that at the first prong of the inquiry,

---

decision.  Cf. Magarian v. Hawkins, 321 F.3d 235, 238 n.4 (1st Cir. 2003) ("While a federal court sitting in diversity must apply the forum state's choice-of-law rules, . . . the court may accept the parties' agreement as to the choice of law without independent analysis of the governing rules." (citation omitted)).

"the subject matter of the interactions are 'commercial undertakings involving[']
commercial parties," and at the second prong, "there is little question that the parties
here were acting in a commercial context."  Docket # 17, at 6 (quoting Grand Pac. Fin.
Corp. v. Brauer, 783 N.E.2d 849, 860 (Mass. App. Ct. 2003)).  However, this argument
runs counter to existing case law, which makes clear that "[a]n interaction is not
commercial in nature if it is a 'purely private' intra-enterprise interaction," such as
disputes between parties to a partnership or a joint venture.  States Res. Corp. v. The
Architectural Team, Inc., 433 F.3d 73, 84 (1st Cir. 2005) (quoting Linkage Corp., 679
N.E.2d at 207 n. 33); cf. Szalla v. Locke, 657 N.E.2d 1267, 1270 (Mass. 1995)
(concluding that there was "no commercial transaction on these facts in the sense
required by [Chapter] 93A" when the "defendant and the plaintiff made a private
arrangement to form a business together," and explaining that "[t]he association
between the plaintiff and the defendant in the interests of forming a business venture
together is not the kind of commercial transaction regulated by the statute").  And so, at
step one, the dispute falls outside of 93A's purview.

   Plaintiff also contends that Chapter 93A is available because the negotiations
leading to the partnership agreement were a sham.  She points to, among other cases,
Goldbaum v. Weiss, 738 N.E.2d 1154 (Mass. App. Ct. 2000).  In Goldbaum, the
Massachusetts Appeals Court held that because a "flurry of document drafting which
'contemplated' a joint venture was not only a distinct phase, but a sham one," Chapter
93A applied.  738 N.E.2d at 1157.  And the cases on which the court relied in
Goldbaum suggest that Chapter 93A is available in cases of fraud.  See McEvoy Travel
Bureau, Inc. v. Norton Co., 563 N.E.2d 188, 194 (Mass. 1990) ("Common law fraud can

be the basis for a claim of unfair or deceptive practices under the statute.").[3]  But even

assuming 93A can apply in fraud cases between business partners, the complaint fails

to adequately allege fraud.  See supra Section III.H.  Accordingly, Chapter 93A is

unavailable here.  The motion to dismiss Count I is ALLOWED.

## B.    Count II – Breach of Contract

Next, plaintiff alleges that she, Huntington, and PVG "entered into a binding,

enforceable partnership contract," which these defendants breached.  Docket # 1-1, at

¶ 71.  She pleads that she and defendants "reached an oral agreement on all material

terms of the partnership," and that she "performed her contractual duties," but

defendants failed to perform theirs.  Id. at ¶¶ 72–74.  In plaintiff's opposition to

defendants' motion to dismiss, she states that "there can be no disagreement . . . that a

joint venture/partnership agreement existed" and that "this was not a partnership with

an expressly limited duration."  Docket # 17, at 10.

Accepting plaintiff's allegations as true, as I must at this posture, leads to the

conclusion her breach of contract claim must be dismissed.[4]  "Where a partnership

agreement provides that the partnership is to continue indefinitely, and the partnership

is therefore 'at will,' a partner has the right to dissolve the partnership, and the

dissolution occurs '[w]ithout violation of the agreement between the partners.'"  Meehan

---

[3]      Goldbaum also cites NASCO, Inc. v. Pub. Storage, Inc., 29 F.3d 28 (1st Cir. 1994).  In
NASCO, the First Circuit reversed the district court's grant of summary judgment in favor of defendant on
plaintiff's 93A claim.  29 F.3d at 34.  The court explained that  it "believe[d] . . .  a reasonable jury could
conclude from the evidence in this case that [defendant] breached the Agreement in order to obtain for
itself unbargained-for benefits to the detriment of [plaintiff]."  Id.  As discussed in Section III.B, supra,
plaintiff's contract claim fails, so this case is inapposite.  Further, plaintiff does not contend that NASCO or
its reasoning applies here.

[4]      It is possible that had plaintiff not pleaded in such a way, she may have had a breach of
contract claim.

v. Shaughnessy, 535 N.E.2d 1255, 1260 (Mass. 1989) (alteration in original) (quoting Mass. Gen. Laws. ch. 108A, § 31(1)).  Based on plaintiff's own pleadings, defendants' decision to dissolve the partnership did not constitute a breach of contract.

In her opposition, plaintiff contends that upon dissolution, she is entitled to a share of the benefits and assets.  "Under Massachusetts law, upon dissolution of an at-will partnership, each partner 'has the right to wind up the partnership affairs.'" Loan Modification Grp., Inc. v. Reed, 694 F.3d 145, 151 (1st Cir. 2012) (quoting Mass. Gen. Laws ch. 108A, § 37).  "Each partner's right to 'wind up' includes 'the right to an account of his interest' in the partnership . . . and the right to receive the payment of 'the net amount due him from the partnership.'" Id. at 152 (quoting Mass. Gen. Laws ch. 108A, §§ 43, 38).

As an initial matter, plaintiff's complaint is styled as alleging a breach of a partnership agreement, not that she was improperly denied partnership assets upon dissolution or that the partnership was not wound up properly.  However, even construing plaintiff's complaint to advance the argument she now makes in her opposition, her complaint does not include what assets the partnership had at dissolution or to what interest she was entitled at dissolution.[5]  Plaintiff says that "the venture [she] developed is now set to go to market . . . and is anticipated to generate significant profits for its shareholders over time," Docket # 1-1, at ¶ 61, that she "was to

---

[5]    Also problematic for plaintiff's new argument that she is entitled to partnership assets is that the "breach" occurred prior to the partnership's business coming into fruition.  Compare Docket # 1-1, at ¶ 72 (alleging that plaintiff and defendants "were to enter into a new business venture . . . in which [plaintiff]'s business concept would be brought to market"), with Loan Modification Grp., 694 F.3d at 148, 152 (finding defendant failed to wind up the partnership when dissolution occurred almost a year after the company was created).

maintain a substantial equity stake (10%–15%) in the new venture," id. at ¶ 72, and that

she "has been injured and has suffered substantial damages," id. at ¶ 75.  This is

insufficient to suggest the partnership, at the time of dissolution, had assets or interests

to which she is entitled.  The motion to dismiss Count II is ALLOWED.

### C.   Count III – Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count III, plaintiff alleges that "[t]he oral contract contains an implied covenant

of good faith and fear dealing," and that Huntington and PVG "breached the implied

covenant of good faith and fair dealing by, inter alia, refusing to perform their duties

under the partnership contract and [by] excluding [plaintiff] from the proposed business

venture she had been developing for years."  Docket # 1-1, at ¶¶ 77–78.

Under Massachusetts law, "[t]he covenant of good faith and fair dealing is

implied in every contract."  Uno Rests., Inc. v. Bos. Kenmore Realty Corp., 805 N.E.2d

957, 964 (Mass. 2004).  "The covenant may not, however, be invoked to create rights

and duties not otherwise provided for in the existing contractual relationship, as the

purpose of the covenant is to guarantee that the parties remain faithful to the intended

and agreed expectations of the parties in their performance."  Id.  Accordingly, "[t]he

scope of the covenant is only as broad as the contract that governs the particular

relationship."  Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005).

Because plaintiff pleaded a partnership existed, and under such an agreement, a

partner can dissolve the partnership at will, see Mass. Gen. Laws ch. 108A, § 31(1)(b),

plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails.

Plaintiff cannot use the implied covenant to impose an obligation on defendants to

continue the partnership, when such an obligation otherwise does not exist.  The motion to dismiss Count III is ALLOWED.

> **D.    Count IV – Breach of Fiduciary Duty/Usurping of Corporate Opportunities**

Plaintiff alleges in this count that Huntington and LaDue as her "partners under the partnership contract, owed [her] fiduciary duties of the utmost good faith and loyalty," and that their actions "constituted a breach of their fiduciary duties . . . and a usurping of [plaintiff]'s corporate opportunities."  Docket # 1-1, at ¶¶ 81–82.

"It is well settled that partners owe each other a fiduciary duty of 'the utmost good faith and loyalty.'" Meehan, 535 N.E.2d at 1263 (quoting Cardullo v. Landau, 105 N.E.2d 843, 845 (Mass. 1952)).  "As a fiduciary, a partner must consider his or her partners' welfare, and refrain from acting for purely private gain."  Id.  However, dissolving the partnership or planning to compete with the partnership do not necessarily constitute breaches of fiduciary duty.  See id. at 1264 (explaining that "fiduciaries may plan to compete with the entity to which they owe allegiance, 'provided that in the course of such arrangements they [do] not otherwise act in violation of their fiduciary duties'" (alteration in original) (quoting Chelsea Indus., Inc. v. Gaffney, 449 N.E.2d 320, 326 (Mass. 1983))).

Here, plaintiff's claim for breach of fiduciary duty seems to be based on defendants moving forward with lēf Farms Corp. without her.  This is insufficient to survive a motion to dismiss.  Insofar as plaintiff claims that defendants engaged in other

improper actions, these claims are addressed elsewhere in this decision.[6]  The motion

to dismiss Count IV is ALLOWED.

### E.    Count V – Promissory Estoppel/Detrimental Reliance

In Count V, plaintiff alleges that Huntington and PVG "promised to start a new

business venture with [her] in which she would hold founder's rights, including a

substantial equity interest."  Docket # 1-1, at ¶ 85.  Plaintiff says that she "reasonably

relied on Defendants' promises regarding the new venture," and that defendants

"breached [their] promise to [her] by excluding her from the new venture."  Id. at ¶¶

86–87.

"In order to state a claim for promissory estoppel under Massachusetts law, a

plaintiff must allege that '(1) a promisor makes a promise which he should reasonably

expect to induce action or forbearance of a definite and substantial character on the

part of the promisee, (2) the promise does induce such action or forbearance, and (3)

injustice can be avoided only by enforcement of the promise.'"  Carroll v. Xerox Corp.,

294 F.3d 231, 242 (1st Cir. 2002) (quoting Loranger Const. Corp. v. E.F. Hauserman

Co., 374 N.E.2d 306, 308 (Mass. App. Ct. 1978)).  Massachusetts courts "do not use

---

[6]        In her opposition, plaintiff states, "by engaging in sham negotiations, making false
promises, coopting [plaintiff]'s proprietary information and failing to distribute her equity share upon her
termination from the partnership, retaining it instead for themselves, the Defendants plainly breached their
respective fiduciary duties to [plaintiff]."  Docket # 17, at 13.  Plaintiff's allegation of sham negotiations and
false promises is addressed in Section III.H, infra; the allegation of coopting proprietary information is
addressed in Section III.G, infra; and the allegation of failing to give her an equity stake is addressed in
Section III.B, supra.
        To the extent plaintiff alleges defendants usurped corporate opportunities, this claim fails
as well.  A "partner has a fiduciary obligation to the partnership of the utmost good faith and loyalty and
cannot divert a business opportunity for his own gain without first making a complete and unambiguous
disclosure to the partnership."  Wartski v. Bedford, 926 F.2d 11, 14 (1st Cir. 1991).  Plaintiff's complaint
does not suggest that defendants diverted a business opportunity for their own personal gain; rather, she
alleges that they usurped her corporate opportunity by moving forward with the business without her.  See
Docket #1-1, at ¶ 82.

the expression 'promissory estoppel,' since it tends to confusion rather than clarity."
Loranger Const. Corp. v. E. F. Hauserman Co., 384 N.E.2d 176, 179 (Mass. 1978).
However, "[w]hen a promise is enforceable in whole or in part by virtue of reliance, it is
a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating
the modern doctrine of consideration."  Id.  Accordingly, "an action based on reliance is
equivalent to a contract action, and the party bringing such an action must prove all the
necessary elements of a contract other than consideration."  R.I. Hosp. Trust Nat'l Bank
v. Varadian, 647 N.E.2d 1174, 1179 (Mass. 1995).

Here, plaintiff pleaded that in 2012, defendants agreed to enter a partnership
with her where each party would have an equity stake.  Docket #1-1, at ¶¶ 23, 24.  "[I]n
reliance on their mutual promises regarding their business venture and her ownership
stake in it," plaintiff devoted "substantial professional time and significant personal
resources to this endeavor . . . without pay."  Id. at ¶¶ 26, 28.  Further, plaintiff declined
other opportunities in reliance on her and defendants' "mutual promises regarding their
business venture and her ownership stake in it."  Id. at ¶ 28.  In 2014, plaintiff provided
Huntington with a memorandum "memoraliz[ing] their essential business agreement for
the new venture."  Id. ¶ at 34.  Defendants then decided to move forward without
plaintiff and "offered her nothing: no founder's rights, no equity stake, no
compensation."  Id. at ¶ 59.  This suffices to survive a motion to dismiss.

Defendants maintain that plaintiff's claim fails because "negotiations do not
provide a basis for reasonable reliance."  Docket # 7, at 11.  However, plaintiff alleges
more than "negotiations"; she claims that Huntington had made a promise that together
they would participate in a partnership in which she would have an equity stake, even

13

though the exact terms had not been finalized when she acted on this promise.  Cf. Neuhoff v. Marvin Lumber & Cedar Co., 370 F.3d 197, 204 (1st Cir. 2004) (concluding there was "a genuine issue of material fact" as to whether the "promisor . . .  should reasonably expect to induce action or forbearance" when defendant "promised [plaintiffs] that their remaining defective windows would be replaced[, and] [s]uch a promise coincided with [defendants'] policy and practice of replacing defective windows," notwithstanding the lack of any written documents containing this promise); see also Dixon v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 336, 346 (D. Mass. 2011) ("As the cases reveal, where . . . the promisor opportunistically has strung along the promisee, the imposition of liability despite the preliminary stage of the negotiations produces the most equitable result.").  The motion to dismiss Count V is DENIED.

### F.     Count VI – Quantum Meruit/Unjust Enrichment

Next, plaintiff alleges that Huntington, LaDue, and PVG's conduct "resulted in financial gain and benefit for the Defendants at the expense and detriment of" plaintiff. Docket # 1-1, at ¶ 90.  She claims that defendants' "retention of [her] business plans, marketing research, economic and technical models and branding concepts . . . is against the fundamental principles of justice and equity and good conscience," and that "it would be unjust and inequitable for Defendants to reap the benefits of [plaintiff]'s contributions to the new business venture without payment and/or reimbursement to her."  Id. at ¶¶ 91–92.

To prevail on a claim for unjust enrichment, plaintiff must establish that: "(1) [defendants] knowingly received a benefit (2) at [her] expense (3) under circumstances that would make retention of that benefit unjust."  Frappier v. Countrywide Home Loans,

Inc., 645 F.3d 51, 58 (1st Cir. 2011).  "[A] claim for unjust enrichment does not require

consideration, but there must be 'unjust enrichment of one party and unjust detriment to

another party.'"  Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47,

57 (1st Cir. 2009) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,

412 F.3d 215, 234 n.7 (1st Cir. 2005)).  Massachusetts courts have allowed "quantum

meruit recovery" based on "the theory of unjust enrichment."  See J.A. Sullivan Corp. v.

Commonwealth, 494 N.E.2d 374, 377 (Mass. 1986) (explaining that "[q]uantum meruit

is a theory of recovery, not a cause of action.  It is a claim independent of an assertion

for damages under the contract, although both claims have as a common basis the

contract itself").

Here, plaintiff alleges that from 2012 until 2015, she helped defendants develop

a business model.  She claims that she "devote[d] substantial professional time and

significant personal resources to this endeavor . . . without pay" and that she

"expend[ed] her own financial resources to compensate staff for the joint venture and to

pay certain costs associated with site exploration."  Docket # 1-1, at ¶¶ 26, 32.  In

addition, plaintiff alleges that even when they agreed to provide her with a "modest

income" under the 2014 "consulting agreement," these "modest amounts paid . . .

represent[ed] a small fraction of what her consulting services routinely bill at in the

market; she agreed to the modest rate on the mutual understanding that this agreement

did not attempt to compensate her fully for her efforts or her contributions to the parties'

joint venture but was simply designed to assist her financially as the company ramped

up."  Id. at ¶¶ 38–39.  When defendants decided to move forward without plaintiff, she

claims she was offered "nothing: no founder's rights, no equity stake, no

compensation." Id. at ¶ 59.  These allegations are enough to state a claim for unjust enrichment.

Defendants maintain that plaintiff should not be entitled to plead unjust enrichment because she "alleges a variety of legal wrongs and the breach of an express contract."  Docket # 7, at 12.  See Fernandes v. Havkin, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) ("A claim of unjust enrichment . . .  is 'not available to a party with an adequate remedy at law.' . . . The[] mere availability [of adequate remedies] is a bar to a claim of unjust enrichment." (quoting Ben Elfman & Son, Inc. v. Criterion Mills, Inc., 774 F. Supp. 683, 687 (D. Mass.1991))).  However, because plaintiff pleaded she had entered a partnership with defendants, the breach of contract claim is unavailable to her.  She can therefore pursue an unjust enrichment claim to recover expenditures that would otherwise unjustly benefit the defendants.  Cf. Szalla, 657 N.E.2d at 1271 ("Quantum meruit damages is a reasonable theory of recovery when a partner is excluded from a partnership prior to a business opening.").[7]  To be sure, "[w]here the same acts cause the same injury under more than one theory, duplicative damage recoveries will not be permitted."  Id.  However, at this stage, plaintiff is entitled to plead both her promissory estoppel and unjust enrichment claims.  Cf. AECOM Technical Servs. Inc. v. Mallinckrodt LLC, 117 F. Supp. 3d 98, 113 (D. Mass. 2015).  The motion to dismiss Count VI is DENIED.

---

[7]     Defendants do not argue that the equitable remedy of promissory estoppel precludes plaintiff from pursuing a claim of unjust enrichment.  While "[e]quitable remedies, for example (unjust enrichment, promissory estoppel), are not available where a plaintiff has a remedy at law (contract)," Moore v. Laz-Z-Boy, Inc., No. 07-cv-10708-RGS, 2008 WL 2247146, at *3 n.6 (D. Mass. May 30, 2008), defendants have not identified any cases suggesting the availability of one equitable remedy precludes a plaintiff from pursuing another.  Nor have I found any.  Cf. Robinson v. Spencer Stuart, Inc., No. 13-cv-10278-RWZ, 2015 WL 12732421, at *5 (D. Mass. Feb. 24, 2015) ("Promissory estoppel and unjust enrichment are equitable remedies available in the absence of a contract only.").

**G.    Count VII – Misappropriation of Trade Secrets Under Mass. Gen. Laws ch. 93, §§ 42, 42A**

In Count VII, plaintiff alleges that defendants misappropriated trade secrets in violation of Massachusetts General Laws Chapter 93, § 42.  She claims that she "had in her possession certain confidential trade secrets," that she "took reasonable measures to maintain the confidentiality of the trade secrets," and that defendants, "by excluding [her] from the new business venture, unlawfully took, carried away, copied and/or obtained trade secrets from [plaintiff] by fraud and deception."  Docket #1-1, at ¶¶ 96–98.

Under Massachusetts General Laws, "[w]hoever embezzles, steals or unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort to such person or corporation for all damages resulting therefrom."  Mass. Gen. Laws ch. 93, § 42.  "The term 'trade secret' . . . means and includes anything tangible or intangible or electronically kept or stored, which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production or management information, design, process, procedure, formula, invention or improvement."  Id. ch. 266, § 30(4).  "To prevail on a claim of misappropriation of trade secrets, a plaintiff must show: 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret."  Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir.

17

2007).[8]

Even assuming plaintiff adequately identified any trade secrets, she failed to plead that she took reasonable steps to maintain their secrecy.  Her complaint provides no basis for concluding she took any measures to safeguard the information she now claims is a trade secret.[9]  Accordingly, her claim cannot survive a motion to dismiss. See Incase, 488 F.3d at 53 ("The fact that [plaintiff] kept its work for [defendant] private from the world is not sufficient; discretion is a normal feature of a business relationship. Instead, there must be affirmative steps to preserve the secrecy of the information as against the party against whom the misappropriation claim is made."); J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 260 N.E.2d 723, 731 (Mass. 1970) (explaining that "one who claims that he has a trade secret must exercise eternal vigilance. This calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it.  To exclude the public from the manufacturing area is not enough." (citation omitted)).  The motion to dismiss Count VII is ALLOWED.

_____

[8]     Plaintiff brings her claim under the statute, but in her opposition relies on cases that discuss the common-law tort of misappropriation of trade secrets.  It makes no difference to the outcome here, as "[t]he statutory and common-law claims may be essentially equivalent." Incase, 488 F.3d at 52 n.10; see also Whipps, Inc. v. Ross Valve Mfg. Co., No. 14-cv-40045-TSH, 2014 WL 1874754, at *8 n.3 (D. Mass. May 8, 2014).

[9]     Indeed, plaintiff acknowledges that she made a presentation about the venture to parties including Huntington's bank and advisors.  She says only in her opposition and surreply that the defendants had a duty not to share confidential information outside the partnership, and that the bankers and the advisors to which she made a presentation about the venture too had an obligation "to hold matters in confidence."  Docket # 22, at 4.  This was not pleaded in plaintiff's complaint, and in any event, still does not demonstrate sufficient affirmative steps to safeguard any trade secrets.

### H.     Count VIII – Fraudulent Misrepresentation

In this count, plaintiff alleges that defendants made "false and material misrepresentations" both "in order to induce her to share confidential secrets with them" and "in connection with inducing her to sign the Consulting Agreement without the subsequent execution of the Purchase Agreement."  Docket # 1-1, at ¶¶ 103–104.  She claims that she relied on these "false and misleading representations when moving forward with the proposed business venture."  Id. at ¶ 105.

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "The particularity requirement means that a complaint must specify 'the time, place, and content of an alleged false representation.'"  United States ex. rel. Kelly v. Novartis Pharm. Corp., 827 F.3d 5, 13 (1st Cir. 2016) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996)).  Further, "Rule 9(b) requires not only specifying the false statements and by whom they were made but also identifying the basis for inferring scienter."  N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009).  Although "evidence and detailed facts are not required where allegations of fraud set forth the specific basis for the claim[,] . . . supporting facts on which the belief is founded must be set forth in the complaint."  Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) (explaining that "Rule 9(b) requires 'specification of the time, place and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred'" (quoting McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir. 1980))).

Here, plaintiff's allegations are insufficient to meet Rule 9(b)'s standard.  She

19

alleges that defendants "made false and material misrepresentations," Docket # 1-1, at ¶ 104, but does not articulate what these misrepresentations are — certainly not to the extent required under Rule 9.  Cf. Doyle, 103 F.3d at 193–94 (affirming district court's dismissal of count alleging "fraud, deceit and misrepresentations" when the "amended complaint include[d] no specification of the time, place, and content of an alleged false representation").  And to the extent plaintiff argues in her opposition that Huntington's statements about intending to enter a partnership were fraudulent, she fails to adequately "identify[] the basis for inferring" a fraudulent intent at the time the statements were made.  See N. Am. Catholic Educ. Programming Found., Inc., 567 F.3d at 13; cf. id. ("[Plaintiff] provides no information in the complaint to suggest that the defendants feigned their original expressed intention . . . . .  The complaint says that Goldman Sachs never intended to follow its business plan but the assertion is not itself supported with particulars that suggest scienter and so just pushes the pleading deficiency back one stage; no particulars are pleaded which would suggest the elements of fraud in the inducement.").  The motion to dismiss Count VIII is ALLOWED.

**I.    Count IX – Tortious Interference with Prospective Business Relations**

Next, plaintiff alleges that Huntington, LaDue, and PVG "intentionally, knowingly, willingly and through improper means and motive interfered with [plaintiff]'s advantageous business relationship with Mr. LaDue by dismissing [her] from the new business venture."  Docket #1-1, at ¶ 109.

Under Massachusetts law, to state a claim for tortious interference with business relations, a plaintiff must allege the following elements: "(1) the existence of a contract

or a business relationship which contemplated economic benefit; (2) the defendants'

knowledge of the contract or business relationship; (3) the defendants' intentional

interference with the contract or business relationship for an improper purpose or by

improper means; and (4) damages." Swanset Dev. Corp. v. City of Taunton, 668

N.E.2d 333, 338 (Mass. 1996).  "A claim of interference with an advantageous business

relationship [requires proof that one,] without privilege to do so, intentionally induces or

causes a third person not to enter into or continue a business relationship with another."

Riseman v. Orion Research Inc., 475 N.E.2d 398, 400 (Mass. 1985).  One cannot be

liable for tortiously interfering with his or her own relationship with another.  See id.

        Plaintiff's claim against LaDue fails, as LaDue cannot tortiously interfere with his

own relationships.  See id.  Plaintiff's allegation that Huntington and PVG interfered with

her relationship with LaDue fares no better.  The complaint states that Karter introduced

LaDue to Huntington and that "Huntington and PVG entered into a consulting

agreement with Mr. LaDue and paid his consulting fees."  Docket # 1-1, at ¶ 32. This

consulting agreement undermines plaintiff's claim she had an "advantageous business

relationship" with LaDue.  See id. at ¶ 109.

        Seemingly unaware[10] that Count IX of her complaint unambiguously alleges that

defendants tortiously interfered with her "advantageous business relationship with Mr.

LaDue," id. (emphasis added), plaintiff argues in her opposition "that the Defendants

intentionally interfered with [her] interest in her company, first by falsely inducing her to

form a partnership with them and provide them access to her planning and expertise,

---

        [10]    Or perhaps, in the words of Christopher Fry, with "prolific indifference."  See Christopher
Fry, A Sleep of Prisoners 24 (1953).

21

second, by usurping the name and identity of the joint venture as their own without her knowledge, [and] third by wholly cutting her out of the venture and its benefits." Docket # 17, at 19. Plaintiff claims in her surreply that she is not amending her complaint through this change in position because she pleaded these facts in her complaint. Whether plaintiff suggested these facts elsewhere in her complaint, Count IX clearly states that the claim for tortious interference is with regard to her relationship with LaDue.[11] The motion to dismiss Count IX is ALLOWED.

### J.    Count X – Conversion

In this final count, plaintiff alleges that Huntington, LaDue, and PVG "have converted [her] trade secrets for their own use." Docket # 1-1, at ¶ 112.

"The elements of conversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment." In re Hilson, 863 N.E.2d 483, 491 (Mass. 2007). "At common law, a conversion claim is viable only in cases involving tangible chattels," and courts throughout this district have "consistently held that a plaintiff is not entitled to recover for conversion of intangible property." Blake v. Prof'l Coin Grading Serv., 898 F. Supp. 2d 365, 386 (D. Mass. 2012) (collecting cases). But

---

[11]    In any event, the argument plaintiff makes in her opposition and surreply is unpersuasive, as she identifies no actual relationships with which defendants interfered — only "with [her] interest in her company," Docket # 17, at 19. Cf. Katin v. Nat'l Real Estate Info. Servs., Inc., No. 07-cv-10882-DPW, 2009 WL 929554, at *8 (D. Mass. Mar. 31, 2009) ("[C]ases applying Massachusetts law have made it clear that where a plaintiff alleges interference only with its general efforts to compete for prospective customers in the market at large, it has not satisfied even the first element of a tortious interference claim — the existence of an advantageous business relationship."); Riseman, 475 N.E.2d at 400 ("A claim of interference with an advantageous business relationship involves one who, without privilege to do so, intentionally induces or causes a third person not to enter into or continue a business relationship with another.").

see In re TJX Cos. Retail Sec. Breach Litig., 564 F.3d 489, 499 (1st Cir. 2009) ("Whether or not Massachusetts limits conversion claims to tangible property is debatable.").[12]

Here, plaintiff claims that defendants converted intangible property, namely her "trade secrets."  In her opposition she identifies only "the taking of proprietary information" and her "interest in the business of the ongoing entity she agreed to create with the Defendants."  See Docket # 17, at 20.  Her surreply introduces a new argument: that the "600,000 square foot greenhouse" defendants are planning to build by 2021 constitutes a physical object "in which her trade secrets have merged."  See Docket # 22, at 5.  But this still does not constitute physical property that defendants could have converted.  See Blake, 898 F. Supp. 2d at 386 ("The AURA System, the (+) designation, and [plaintiff]'s marketing plan are intangible property; therefore, [plaintiff]'s claims of conversion are not viable."); Exp. Lobster Co. Inc. v. Bay State Lobster Co., No. CA926348E, 1994 WL 902930, at *6 n. 16 (Mass. Super. Oct. 31, 1994) ("[T]here has been no showing that [defendant] continues to possess the actual 'customer lists,' which would be the personalty at issue in a claim for conversion.").  The motion to dismiss Count X is ALLOWED.

---

[12]    Even if intangible trade secrets could be converted, plaintiff would still not have a claim here.  "Because of the  intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984).  "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."  Id.  For the reasons discussed in Section III.G, supra, plaintiff did not sufficiently allege she took affirmative steps to protect any trade secrets she may have had.  Therefore, defendants use of the information was not improper.  See Blake, 898 F. Supp. 2d at 387 ("Defendants did not 'wrongfully exercise acts of ownership' of the property when the alleged conversion occurred because they had the right to make use of the public domain information." (quoting Mass. Eye & Ear Infirmary, 412 F.3d at 230)).

**IV. Conclusion**

  The defendants' motion to dismiss (Docket # 6) is ALLOWED as to Counts I, II, III, IV, VII, VIII, IX, and X, and is DENIED as to Counts V and VI.


   March 31, 2017            /s/Rya W. Zobel

     DATE                RYA W. ZOBEL
                 SENIOR UNITED STATES DISTRICT JUDGE